**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADRIANE TAMEKO JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-0041 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

**NORA BARRY FISCHER, DISTRICT JUDGE**

### I.     INTRODUCTION

Adriane Tameko Johnson ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-402 ("the Act") and supplemental security income ("SSI") under Title XVI.

### II.     PROCEDURAL HISTORY

Plaintiff applied for both DIB and SSI on July 30, 2010, claiming an amended disability onset date of February 14, 2009. (R. at 18).[1] Both claims initially were denied on October 14, 2010. (R. at 13, 115, 120). Plaintiff requested an administrative hearing as to the DIB determination on November 24, 2010. (R. at 13, 128). This hearing was conducted on December 2, 2011 in Mars, Pennsylvania at which Plaintiff, represented by Katrine M. Erie, Esq., and an impartial vocational expert testified. (R. at 13).

---

[1] Citations to Doc. Nos. 5-2 through 5-32 are hereinafter referred to as "R. at ___."

On June 12, 2012, the Administrative Law Judge ("ALJ"), Brian W. Wood, issued his ruling, which was unfavorable to Plaintiff. (R. at 29). On July 25, 2012, Plaintiff initiated a request for review of the ALJ's decision regarding DIB to the Appeals Council. (R. at 9). Plaintiff's attorney also submitted a letter to the Appeals Council, dated October 11, 2012, arguing that the ALJ's decision should be reversed, and the Council should either remand the case back to the ALJ for further analysis of the record or find the claimant disabled and, therefore, unable to engage in substantial gainful activity. (R. at 263-87). On November 14, 2013, the Appeals Council denied Plaintiff's request for review, thereby making the decision of the ALJ the Commissioner's final decision. (R. at 1). Plaintiff filed her Complaint on January 9, 2014. (Docket No. 1). Defendant filed her Answer on April 3, 2014. (Docket No. 4). The parties then filed cross-Motions for Summary Judgment. (Docket Nos. 10, 14). The matter, having been fully briefed (Docket Nos. 11, 15), is now ripe for disposition.

## III.  STATEMENT OF FACTS

### A.  General Background

Plaintiff was born on December 20, 1972 and was thirty-eight years old at the time of her administrative hearing. (R. at 45). Plaintiff is not married and lives with her three children. (R. at 47). Her income consists of County assistance and unemployment extension. (*Id.*). She does not have problems getting along with others, and has never been fired from a job due to problems with coworkers. (R. at 18).

Plaintiff earned a high school diploma. (R. at 48, 252). In October 2009, she began at Sanford-Brown Institute, pursuing an associate's degree in anesthesia technology, but withdrew in September 2011 due to an excess of absences caused by medical impairments. (R. at 48-49, 252). Plaintiff's most recent employment was at Holy Cross Hospital in Silver Spring, Maryland, working as a Tech Assistant, until she was terminated in April 2008. (R. at 52-53). This job

consisted of setting up for contrast injections, turning over the room for the next procedure, and helping with biopsies. (R. at 53). Previously, Plaintiff held the job of a child care worker from 2000-2002. (R. at 97). From 2001-2002, she was a shipper for Mail Boxes Etc., where she was required to lift more than 50 pounds. (R. at 55, 98, 249). She then worked as a child development teacher for preschoolers at the C.H.I.L.D Center in 2002. (R. at 55, 97, 249). For seven months in 2004, she worked part-time at Holy Cross Hospital as an in-house transporter, a job which entailed moving patients from one place to another. (R. at 54, 98, 249). From 2004-2008, she was a radiology technician at Holy Cross. (*Id.*).

In her application for DIB and SSI, Plaintiff claimed that she has been unable to work since the amended onset date of February 14, 2009 due to the following health conditions: bilateral carpal tunnel syndrome (CTS),[2] tendinopathy of the left shoulder, mild degenerative disc disease (DDD) of the thoracic and lumbar regions, chronic otitis externa,[3] obstructive sleep apnea, Marfan Syndrome,[4] the residual effects of a thoracic aortic aneurysm[5] with repair, abdominal aortic aneurysm, gastroesophageal reflux disease (GERD), goiter, diabetes mellitus,[6] polycystic ovary syndrome,[7] hypertension, obesity, and major depression. (R. at 15).

---

[2] Carpal tunnel syndrome is a "condition in which there is excessive pressure on the median nerve. This is the nerve in the wrist that allows feeling and movement to parts of the hand. Carpal tunnel syndrome can lead to numbness, tingling, weakness, or muscle damage in the hand and fingers." PUBMED HEALTH http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001469/ (last visited Jul. 29, 2014).

[3] Acute otitis externa is an inflammatory condition of the ear canal, with or without infection. Symptoms include ear discomfort, itchiness, discharge and impaired hearing. It is also known as 'swimmer's ear' and can usually be treated successfully with a course of ear drops. PUBMED HEALTH http://www.ncbi.nlm.nih.gov/pubmed/20091565 (last visited Jul. 22, 2014).

[4] Marfan syndrome is a disorder that affects the connective tissue, which is the tissue that strengthens the body's structures. Disorders of connective tissue affect the skeletal system, cardiovascular system, eyes, and skin. PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001455/ (last visited Jul. 22, 2014).

[5] "An aneurysm is an abnormal widening or ballooning of a portion of an artery due to weakness in the wall of the blood vessel." A thoracic aortic aneurysm occurs in the part of the body's largest artery, the aorta, which passes through the chest. PUBMED HEALTH http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002107/ (last visited Jul. 29, 2014).

[6] Diabetes mellitus is "a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced." STEDMAN'S MEDICAL DICTIONARY 529 (28th ed. 2006).

[7] Polycystic ovary syndrome involves "enlarged cystic ovaries, characteristic of the Stein-Leventhal syndrome." Clinical features of the syndrome are abnormal menses, obesity, insulin resistance, and evidence of masculinization, such as hirsutism. STEDMAN'S MEDICAL DICTIONARY 1396 (28th ed. 2006).

Plaintiff takes care of her children, prepares meals, is able to manage her finances, reads, plays board games, uses a computer, finishes what she starts, and is independent in personal care. (R. at 18, 212-215). Her partner helps out with household chores and caring for Plaintiff's children. (R. at 75, 78-79). She cannot go outside the home alone, because she gets dizzy and falls. (R. at 215). The dizziness also affects her ability to lift, squat, bend, walk, sit, kneel, climb stairs, and use her hands. (R. at 217). In her Self-Report, Plaintiff described her daily activities as including: getting up at 4:30 a.m. to watch TV; making breakfast for herself and her children; reading a book for school; playing computer games; making lunch for her children; preparing dinner; watching TV; and then going to bed. (R. at 212). She occasionally needs to be reminded to take her medication. (R. at 214). She denied problems with personal care. (R. at 213). Plaintiff reported that she does not handle stress well, but rather shuts down and does not talk. (R. at 218). Furthermore, Plaintiff avers that she can walk "a couple of blocks" before needing to rest for 20 minutes. (R. at 217). Otherwise, Plaintiff reports that her level of social activities has not changed since her alleged disability onset because she "never had any activities." (*Id*.).

1. Aneurysms[8]

Plaintiff has developed multiple aneurysms, likely due to Marfan syndrome, which cause chest, back, and stomach pain, daily palpitations, and dizziness. (R. at 252). Plaintiff takes pain medications to cope with the pain. (R. at 59). The Court notes the discrepancies in the record relative to the quantity and frequency of pain medication used by Plaintiff. In her Supplemental Functional Questionnaire, Plaintiff indicated that she does not take pain medicine. (R. at 221). However, in her testimony in front of the ALJ, Plaintiff stated that she "feel[s] addicted to pain medicine." (R. at 91).

---

[8] Aneurysms are the "circumscribed dilation of an artery or a cardiac chamber, in direct communication with the lumen, usually resulting from an acquired or congenital weakness of the wall of the artery or chamber." STEDMAN'S MEDICAL DICTIONARY 83 (28th ed. 2006).

In 1999, Plaintiff went to the emergency room for chest pain where doctors discovered her first thoracic aortic aneurysm. (R. at 726). Plaintiff was five months pregnant, and the aneurysm was stable at that time. (R. at 56-57, 726). Plaintiff lived with the thoracic aortic aneurysm for over ten years, and the pain affected her almost daily. (R. at 58). On a few occasions the pain became so intolerable that she thought her aneurysm was leaking. (*Id.*). Consequently, she went to the emergency room, where it was determined that it only had slightly grown. (*Id.*).

In August 2009, Dr. Chris Cook began monitoring the size and growth of the aneurysm. (R. at 22). In September 2011, the thoracic aortic aneurysm grew to 6.5 centimeters, so Dr. Robert Rhee performed an endovascular repair of the descending thoracic aneurysm. (R. at 57, 253, 982). Plaintiff initially reported that she had some back pain after the surgery, but it was under control with pain medication, so she was discharged. (R. at 982). Dr. Rhee completed a follow-up after the aneurysm repair surgery on October 24, 2011 and reported that Plaintiff was doing well with no complications. (R. at 1373). Since having the surgery, Plaintiff has experienced back pain and breathing problems. (R. at 61). She testified that she thinks these problems are due to lying flat on her back for 10 hours and being intubated the entire time. (*Id.*) She has completed breathing treatments to improve her breathing. (*Id.*). Plaintiff's back pain is between her shoulders, and she takes oxycodone approximately four times per week to deal with same. (R. at 62).

Plaintiff's second aneurysm is a "mild aneurysmal dilation of the abdominal aorta."[9] (R. at 443-45). Her doctors routinely conduct CAT scans every six months in order to check the size of the aneurysm, but it has not yet grown to an operable size. (R. at 63). In a July 2009, Dr. Iozzi performed a CT of the abdomen with contrast. (R. at 443). The CT showed a mild aneurysmal

---

[9] "An abdominal aortic aneurysm occurs when an area of the aorta becomes very large or balloons out." PUBMED HEALTH http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001215/ (last visited Jul. 29, 2014).

dilation of the brachiocephalic artery[10] and a mild aneurysmal dilation of the right common iliac artery.[11] (R. at 443-445). Plaintiff's doctors plan to continue to monitor the size of the aneurysms, but in the meantime, she was prescribed metoprolol to regulate her heart rate. (R. at 65-66).

    2.  <u>Ear Problems</u>

Plaintiff was diagnosed with acute infection otitis externa and chronic bilateral otitis externa ("swimmer's ear"), which cause ear pain, minor loss of hearing, itchiness, drainage, infection, dizziness, and MRSA boils.[12] (R. at 254). Plaintiff's ear problems began in June 2008 after contracting swimmer's ear at her daughter's pool party. (R. at 88). Since the pool party, Plaintiff's chronic ear problems have affected her everyday life by way of requiring daily pain management and preventing her from completing her associate's degree. (R. at 56, 83). Plaintiff had to miss numerous classes at Sanford-Brown Institute because of pain and doctor's visits to acquire antibiotics for episodes of boils. (R. at 83-86).

Plaintiff has been treated in the emergency room for her ear pain and drainage. (R. at 85-86). She was admitted to hospitals on the following occasions: Providence Hospital from June 22 through June 26, 2008; Passavant Hospital on December 7, 2008 and September 17, 2009; and Butler Memorial Hospital on December 25, 2009. (R. at 288, 387, 413, 421). Hospital doctors performed ear examinations with an otology binocular microscope, all of which produced normal results, so Plaintiff was discharged with a prescription for antibiotics. (R. at 791, 798, 809, 815). Dr. Mariann McElwain ("Dr. McElwain") has been the primary doctor treating Plaintiff's ear

---

[10] The brachiocephalic artery is "a short artery that arises from the arch of the aorta and divides into the carotid and subclavian arteries of the right side." MERRIAM-WEBSTER DICTIONARY http://www.merriam-webster.com/medical/brachiocephalic%20artery (last visited Jul. 29, 2014).

[11] A common iliac artery is "either of the large arteries supplying blood to the lower trunk and hind limbs and arising by bifurcation of the aorta which in humans occurs at the level of the fourth lumbar vertebra to form one vessel for each side of the body." MERRIAM-WEBSTER DICTIONARY http://www.merriam-webster.com/medical/iliac+artery (last visited Jul. 29, 2014).

[12] A boil is an infection that affects groups of hair follicles and nearby skin tissue. *Boils,* PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002445/ (last visited Jul. 22, 2014).

problems from 2009-2011. (R. at 21, 455). Dr. McElwain routinely performed ear examinations and provided treatment of Plaintiff, vis-à-vis antibiotics, ear plugs, and follow-up examinations. (R. at 460). Dr. McElwain saw Plaintiff in her office on the following dates: January 2009 (R. at 455); February 2009 (R. at 460); May 2009 (R. at 466); September 2009 (R. at 470); three visits in October 2009 (R. at 474, 478, 482); November 2009 (R. at 486); February 2010 (R. at 505); July 2010 (R. at 513); August 2010 (R. at 517); January 2011 (R. at 789); July 2011 (R. at 782); and August 2011 (R. at 776). According to Dr. McElwain's records, Plaintiff's visits to her office have decreased in frequency over the years. (R. at 455-776). At the time of the ALJ hearing, Plaintiff still had ear problems, and she was in the middle of treatment for an abscess that needed to be lanced. (R. at 85). She continues to have flare-ups, sometimes three times per month, during which she experiences tremendous head and ear pain that leave her unable to function. (R. at 83-84).

3. Lung Disease

In November 2010, Plaintiff started seeing Dr. David Rice for obstructive sleep apnea and shortness of breath from activities such as walking up steps. (R. at 275). Dr. Rice examined an abnormal CT scan and diagnosed Plaintiff with probable emphysema.[13] (R. at 726). He was unsure of the exact diagnosis and needed more testing. (R. at 89, 728). Because of Plaintiff's shortness of breath and emphysema, Dr. Rice strongly recommended that she quit smoking. (R. at 728). Plaintiff had smoked approximately half a pack of cigarettes per day for the last 19 years. (R. at 726). She attempted to quit on numerous occasions, but she claims that she officially quit approximately two weeks before her September 2011 endovascular repair of her descending thoracic aneurysm. (R. at 68-69, 726).

---

[13] Emphysema is a "condition of the lung characterized by increase beyond the normal in the size of air spaces distal to the terminal bronchiole, with destructive changes in their walls and reduction in their number." STEDMAN'S MEDICAL DICTIONARY 631 (28th ed. 2006).

Plaintiff's brief argues that her serious side effects of chronic lung disease are "shortness of breath and chest pain upon exertion." (R. at 276). According to Plaintiff's testimony, her emphysema diagnosis does not cause chest pain or coughing, but she was prescribed an inhaler to help with shortness of breath. (R. at 68, 728-729). She did not have chest pain or shortness of breath during the following doctor's visits: February 2009; August 2009; September 2009; November 2009; January 2010; April 2010; July 2010; August 2010; and November 2010. (R. at 522-528, 609, 611, 613, 726). Plaintiff claims that her breathing troubles have worsened. (R. at 277). She further alleges that her breathing worsened after the endovascular repair of the descending thoracic aneurysm. (R. at 68). She does not know if it is worse specifically from the surgery or if it is a result of her COPD. (*Id.*).

Plaintiff's obstructive sleep apnea has led to insomnia, which she alleges the ALJ failed to mention or even classify as a severe impairment. (R. at 275). Plaintiff uses a Continuous Positive Airway Pressure machine ("CPAP machine") to help her sleep. (R. at 278). In August 2010, Plaintiff's Self-Report states that she goes to bed at 12:00 a.m. and wakes up at 4:30 a.m. (R. at 212). During his evaluation in November 2010, Plaintiff reported to Dr. Rice that she sleeps early in the morning until noon and then takes naps throughout the day. (R. at 726). At the ALJ hearing in December 2011, Plaintiff testified that she goes to bed every night at 3:30 a.m. and wakes up at 6:30 a.m., and occasionally naps for a "couple of hours." (R. at 94-95). Plaintiff also takes Sonata[14] and melatonin to help with her insomnia. (*Id.*).

## B. Physical Health Treatment

Plaintiff has several other health conditions ranging from minor rashes to hypertension. (R. at 20, 90-91). Since the amended onset date, Plaintiff has treated with many physicians,

---

[14] Sonata (zaleplon) is a sedative that causes the body to relax. It is used to help people fall and stay asleep. *Sonata*, http://www.drugs.com/sonata.html (last visited Jul. 22, 2014).

including: Dr. Monisha Medhi for diabetes mellitus and Hirsutism;[15] Dr. Mary Dillon for primary care and hypertension;[16] Dr. Sandeep Jain for palpitations; Dr. Philip Iozzi for primary care; Dr. Robert Carr for gynecological visits; Dr. Aaron Grand and Dr. Marshall Balk for carpal tunnel syndrome and shoulder pain; Dr. Sam Buffer and Dr. Ronald Pellegrini for cardiology; Dr. Rhee, Dr. Cook, and Dr. Luke Marone for aneurysms; Dr. McElwain for ear disease; Dr. Elisabeth Bergman for endocrinology and Hirsutism; Dr. Rice for emphysema and COPD;[17] and Dr. Gerald Streets for depression[18] and ADHD.[19] (R. at 20-22, 91, 248, 421, 610, 626, 726, 735, 1373).

After her hospitalization for lower back pain, Plaintiff claimed an amended disability onset date of February 14, 2009. (R. at 15, 394). She has experienced lower back pain since having surgery to repair her thoracic aortic aneurysm. (R. at 62, 92). She states that the pain is due to the way she was laying on the operating table and that her back hurts when she is laying down. (R. at 220). The pain shoots down her right leg and causes weakness in her leg, so she occasionally uses a cane to help her balance. (R. at 93-94, 396).

Dr. Dillon was Plaintiff's primary care physician from 2009-2011 for ailments including otitis media,[20] sinusitis,[21] cellulitis,[22] a small cyst, and a minor rash. (R. at 20-21). Dr. Dillon's

---

[15] Hirsutism is the presence of excess body or facial terminal (coarse) hair growth in females in a male-like pattern. It affects 5–15 percent of women and is an important sign of underlying androgen excess. PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmed/19567450 (last visited Jul. 22, 2014).
[16] Hypertension is "high blood pressure; transitory or sustained elevation of systematic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences." STEDMAN'S MEDICAL DICTIONARY 927 (28th ed. 2006).
[17] Chronic obstructive pulmonary disease ("COPD") is the "general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied." STEDMAN'S MEDICAL DICTIONARY 554 (28th ed. 2006).
[18] Depression is a "mental state or chronic mental disorder characterized by feelings of sadness, loneliness, despair, low self-esteem, and self-reproach; accompanying signs including psychomotor retardation, withdrawal from social contact, and vegetative states such as loss of appetite and insomnia." STEDMAN'S MEDICAL DICTIONARY 515 (28th ed. 2006).
[19] Attention deficit hyperactivity disorder ("ADHD") is a "behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness, impulsiveness, and hyperactivity." STEDMAN'S MEDICAL DICTIONARY 568 (28th ed. 2006).
[20] Otitis media is "an inflammation of the middle ear." STEDMAN'S MEDICAL DICTIONARY 1394 (28th ed. 2006).

notes state that Plaintiff was well-nourished and well-oriented. (R. at 522). Moreover, Dr. Dillon noted that Plaintiff was a "pleasant female in no acute distress." (R. at 526). In September 2009, Dr. Dillon performed an examination, and he concluded as follows: "review of [Plaintiff's] systems [was] negative for fatigue. It [was] negative for skin rash, negative for chest pain, shortness of breath, abdominal pain or urinary symptoms." (R. at 528). Plaintiff told Dr. Jain that she experienced heart palpitations with increasing frequency over the last year. (R. at 626). She saw Dr. Jain in September 2010 to figure out the cause of her daily palpitations, and he opined that the palpitations could be related to "episodes of anxiety." (R. at 610, 626, 627).

Dr. Carr treated Plaintiff for gynecological care including polycystic ovary syndrome and recurring yeast infections.[23] (R. at 15, 90, 316). Plaintiff was hospitalized in September 2008 to remove a left tubo-ovarian abscess, and was discharged in stable condition. (R. at 352). She was hospitalized in August 2010 for a yeast infection. (R. at 891).

Dr. Grand treated Plaintiff for right shoulder pain and bilateral carpal tunnel syndrome. (R. at 69, 91). Plaintiff's carpal tunnel syndrome caused pain in her wrists especially at night before she went to bed. (R. at 220). Her hands sometimes would go numb, and she would drop what she was holding. (R. at 69). Plaintiff elected to have carpal tunnel repair surgery on both of her wrists.[24] (R. at 69, 441). She had to take a leave of absence from Sanford-Brown Institute to have the second carpal tunnel release surgery. (R. at 50-51). Since having the surgery, Plaintiff does not have pain in her wrists and does not have trouble doing simple activities, such as getting dressed or eating, but she does have some residual tingling. (R. at 68-69).

---

[21] Sinusitis is an "inflammation of the mucous membrane of any sinus, especially the paranasal." STEDMAN'S MEDICAL DICTIONARY 1777 (28th ed. 2006).
[22] Cellulitis is an "inflammation of subcutaneous, loose connective tissue." STEDMAN'S MEDICAL DICTIONARY 343 (28th ed. 2006).
[23] A vaginal yeast infection is "an infection of the vagina "most commonly due to the fungus *Candida albicans*." PUBMED HEALTH http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002480/ (last visited Jul. 29, 2014).
[24] Dr. Grand did not perform surgery on her shoulder, because her rotator cuff was likely only strained. (R. at 91).

In August 2010, Dr. Bergman saw Plaintiff for possible Cushing's disease due to Plaintiff's visible hirsutism. (R. at 268, 610). She diagnosed Plaintiff with uncontrolled hypertension, obesity, impaired glucose tolerance, hirsutism, obstructive sleep apnea, and goiter. (R. at 21, 596). Plaintiff's medications were adjusted accordingly. (*Id*.) Dr. Bergman saw Plaintiff for follow-up visits through October 2011, during which she re-examined Plaintiff and ordered further testing. (R. at 670). Plaintiff's diagnosed hypertension affects her daily living by making her dizzy and nauseas. (R. at 70). Plaintiff is unsure if the nausea is from her hypertension, a combination of different medications, or her diabetes. (R. at 70-71). In a typical month, Plaintiff has at least one episode of nausea that escalates to the point of vomiting. (*Id*.) Furthermore, Plaintiff testified during the ALJ hearing that she lost 40 pounds within the past six months. (R. at 45).

As of September 2011, Plaintiff took the following medications: Strattera,[25] Chlorhexidine, Advair,[26] Lisinopril,[27] Metformin,[28] Metoprolol,[29] Spironolactone, Docusate, and Oxycodone.[30] (R. at 1048-51).

### C. Mental Health Treatment

Plaintiff sees Dr. Streets, a therapist, at Family Psychological Services for anxiety, depression, and ADHD. (R. at 73, 251, 1409). Plaintiff avers that she has been depressed ever since her parents and brother died, but lately she is more depressed due to the deterioration of her

---

[25] Strattera (atomoxetine) affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. *Strattera*, http://www.drugs.com/strattera.html (last visited Jul. 22, 2014).
[26] Advair is a combination of two medicines that are used to help control the symptoms of asthma and improve breathing. *Advair*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010369/ (last visited Jul. 22, 2014).
[27] Lisinopril is used alone or together with other medicines to treat high blood pressure (hypertension). *Lisinopril*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010968/ (last visited Jul. 22, 2014).
[28] Metformin is used to treat high blood sugar levels that are caused by a type of diabetes mellitus or type-2 diabetes. PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011121/ (last visited Jul. 22, 2014).
[29] Metoprolol is used alone or together with other medicines to treat high blood pressure (hypertension). *Metoprolol*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001180/ (last visited Jul. 22, 2014).
[30] Oxycodone is used to relieve moderate to severe pain. *Oxycodone*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001326/ (last visited Jul. 22, 2014).

health. (R. at 73). Dr. Streets evaluated Plaintiff and determined that her Global Assessment Functioning[31] score was 55 in February 2011; 57 in April 2011; 59 in August 2011; and 55 and 57 in November 2011. (R. at 1409-11, 1413, 1418). Dr. Streets examined Plaintiff in November 2011 and opined that she seemed anxious, overwhelmed, and irritable. (R. at 1409). Plaintiff testified that weekly therapy has not helped her anger issues, but she continues to improve. (R. at 73). Dr. Streets also prescribed Plaintiff the medication Strattera for ADHD to help her focus in school. (R. at 73-74).

### D. Testimony

Plaintiff testified at the ALJ hearing that health conditions including dizziness and pain affect her everyday life. (R. at 58). Her pain occurs approximately once or twice per month and lasts for a week at a time. (R. at 59). She takes Oxycontin or Vicodin to cope with the pain, typically four times per week and sometimes every night. (R. at 59, 62). On an average day, Plaintiff would attempt to do household chores, but often her back pain or headaches would prevent her from doing same. (R. at 74). As indicated earlier, her back pain began after the doctors performed the aneurysm surgery, during which she was on her back for approximately ten hours. (R. at 61). Plaintiff's partner helps around the house with almost everything, including cleaning, cooking, and taking care of her children. (R. at 75). Plaintiff does not go out grocery shopping alone, because she does not have access to a car. (R. at 76). Moreover, Plaintiff's dizziness is so debilitating that she needs help getting out of the shower because she has fallen in the past. (R. at 66). She also has nausea to the point that she "just throw[s] up for no apparent reason." (R. at 70). Furthermore, she testified that the CPAP machine works well when she does sleep, but she only sleeps a few hours per night. (R. at 72).

---

[31] The Global Assessment of Functioning Scale ("GAF") assesses whether an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

Socially, Plaintiff does not have many friends in Western Pennsylvania, but does not report any problems getting along with others. (R. at 77). Plaintiff used to be able to be around large crowds, for example she would attend concerts. (*Id.*). However, in recent years she becomes "antsy" and "nervous," so she now avoids large crowds. (*Id.*). At the time of the ALJ hearing, Plaintiff was planning her wedding to her partner. (R. at 78).

### E. Functional Capacity Assessments

In April 2012, Dr. Mohammad Malik performed a consultative examination of Plaintiff, and he reported a generally normal physical examination and a normal gait. (R. at 21, 1448). Dr. Malik's clinical impressions were that Plaintiff has diabetes mellitus, polycystic ovary syndrome, hypertension, and possible Marfan syndrome with tendency for aneurysmal dilation. (R. at 1449). During the course of evaluation, Dr. Malik perceived Plaintiff to have been appropriately dressed, answered questions appropriately, and appeared normal. (*Id.*). She did not appear suicidal or anxious. (*Id.*). However, Dr. Ann Quimby, disability examiner, opined that Plaintiff could not perform past work with her primary diagnosis of carpal tunnel syndrome and a secondary diagnosis of an aortic aneurysm. (R. at 112-114).

### F. Administrative Hearing

At the administrative hearing, Plaintiff testified that she lived with her three children who at the time were 19, 14, and 11 years old. (R. at 47). She last worked in April 2008 at Holy Cross Hospital in Silver Spring, Maryland as a tech assistant. (R. at 52). She was terminated due to budget cuts. (R. at 54). She has been looking for jobs in retail that would permit her to move around and would not involve too much lifting. (R. at 47). Plaintiff had to withdraw from Sanford-Brown Institute because of too many absences associated with doctors' appointments and surgeries. (R. at 48-52). Plaintiff testified that she has battled depression since her parents and brother died, and started attending sessions at Family Psychological. (R. at 73). She attends

therapy every week and was prescribed Strattera for ADHD. (R. at 73-74). Her mental health is slowly improving with the continued therapy. (R. at 73).

Relative to her daily activities, Plaintiff testified that her ability to maintain attention and complete household chores varies. (R. at 74). For example, some days she is able to sweep or mop, but other days her back pain and headaches prevent her from doing same. (*Id.*). Plaintiff does not do the majority of the cooking and cleaning in the house, due to her pain and nausea. (R. at 74-76). Instead, Plaintiff's partner helps to take care of Plaintiff's children and the house. (*Id.*).

After the ALJ questioned Plaintiff, Ms. Erie examined her. (R. at 79). In response to Ms. Erie's questions, Plaintiff testified that she missed school and was forced to withdraw because she was in a "tremendous" amount of ear and head pain that required treatment. (R. at 83). Moreover, Plaintiff was easily exhausted from walking up the stairs, and has trouble breathing due to her lung problems. (R. at 90-91). She has chronic lower back pain that extends down her right leg and often requires her to use a cane for balance. (R. at 93). This lower back pain was the cause of her hospitalization in February 2009, which is the amended onset date of the DIB and SSI claims. (R. at 95-96). Furthermore, Plaintiff testified that she only sleeps three hours per night. (R. at 94).

After Plaintiff's testimony concluded, the ALJ examined the vocational expert, Mr. William Reed. (R. at 96). The vocational expert testified that, based upon his review of Plaintiff's record and her testimony at the hearing, her work history includes five different jobs: (1) child care worker, which is unskilled work and medium exertional level; (2) shipper/driver, which is unskilled work and heavy exertional level; (3) child development teacher, which is semi-skilled work and light to medium in exertional level; (4) part-time in-house transporter for a hospital, which is unskilled work and heavy exertional level; and (5) radiology technician in a

hospital, which is semi-skilled and medium exertional level. (R. at 97-98). The ALJ asked the vocational expert about a hypothetical individual with Plaintiff's age, education, and work experience with the following restrictions: lift and carry 10 pounds occasionally; stand or walk for two hours of an eight-hour workday; sit for six hours of an eight-hour workday; sit or stand option every 30 minutes; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the bilateral upper extremities; must avoid concentrated exposures to fumes, odors, dust, gases, and poor ventilation; and avoid all exposure to hazards such as heights and moving machinery. (R. at 98). The vocational expert testified that this hypothetical individual would not be able to perform any of Plaintiff's past relevant work. (R. at 99). However, Mr. Reed testified that this hypothetical individual would be able to perform a number of jobs in the national economy including work as a light, unskilled mail clerk, excluding the U.S. Postal Service, and for which there were 137,000 jobs; sedentary, unskilled surveillance system monitor, for which there were 95,000 jobs; and, a sedentary assembler, such as a lens inserter, for which there were 280,000 jobs. (R. at 99-100). If Plaintiff were off-task more than twenty percent of the workday, or she missed more than two days of work per month, Dr. Reed testified that no work would be available. (*Id.*).

**G. Administrative Decision**

Pursuant to the Act, health problems must: (1) keep you from doing any kind of substantial work, and (2) last, or be expected to last, for at least 12 months in a row, or result in death. (R. at 116). Substantial work is considered mental or physical work that a person is paid to do, and usually requires a person to earn over $1,000.00 per month, after deducting allowable amounts. (*Id.*). The Administrative Law Judge ruled that Plaintiff could not complete her past work, but the severity of her condition did not preclude her from all work. (R. at 115-16). The

medical impairments do not keep her from doing work that is less physically demanding. (R. at 116).

## IV.   STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Cooper v. Comm'r*, 563 F. App'x 904, 910 (3d Cir. 2014); *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at Step Five to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckle*r, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[32] 1383(c)(3);[33] *Hagans v. Comm'r*, 694 F.3d 287, 292 (3d. Cir. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002). Substantial evidence is "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans*, 694 F.3d at 292 (quoting *Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir. 1999)); *see also Horst v. Comm'r*, 551 F. App'x 41, 45 (3d Cir. 2014).

A district court can neither conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the Court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947); *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998). The Court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable

---

[32] Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[33] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

regulatory interpretations that an agency manifests in the course of making such findings."

*Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

## V. DISCUSSION

In her Motion for Summary Judgment, Plaintiff asserts six arguments. (Docket No. 11). First, she argues that the ALJ did not address or evaluate her impairments of COPD and emphysema and failed to find those impairments "severe." (*Id.* at 18-24). Second, she contends that the ALJ erred in not determining whether the combination of Plaintiff's aneurysms, Marfan syndrome and obesity meets or equals an impairment in Appendix 1. (*Id.* at 24-28). Third, she avers that the ALJ erred in finding that the Plaintiff's statements were not credible. (*Id.* at 28-33). Fourth, she claims that the ALJ did not consider all of Plaintiff's impairments at Step Five and failed to include the impairments in the hypothetical posed to the VE. (*Id.* at 33-34). Fifth, she argues that the ALJ erred in determining that Plaintiff has the RFC to frequently handle and finger. (*Id.* at 34-36). Sixth, she contends that the ALJ's finding that Plaintiff could perform a significant number of jobs in the national economy was based on a flawed hypothetical. (*Id.* at 36-41).

Defendant first argues that the ALJ did not commit an error at Step Two and adequately considered Plaintiff's breathing conditions and thoracic aortic aneurysm. (Docket No. 15 at 15-16). Second, Defendant avers that the ALJ adequately accounted for any restrictions due to Plaintiff's breathing conditions. (*Id.* at 16-18). Third, Defendant claims that the ALJ correctly characterized Plaintiff's thoracic aneurysm. (*Id.* at 18-19). Fourth, Defendant contends that the ALJ adequately addressed Plaintiff's impairments at Step Three. (*Id.* at 19-21). Fifth, Defendant asserts that substantial evidence supports the ALJ's determination that Plaintiff's complaints of completely debilitating limitations lacked credibility. (*Id.* at 21-26). Sixth, Defendant avers that substantial evidence supports the ALJ's RFC determination that Plaintiff could frequently handle

and finger. (*Id.* at 26-27). Lastly, Defendant submits that the VE testimony provides substantial evidence that there are a significant number of jobs that Plaintiff can perform. (*Id.* at 27-30). The Court will address each of these arguments, in turn.

### A. COPD, Emphysema, and Thoracic Aortic Aneurysms

Plaintiff contends that the ALJ did not consider, evaluate, or mention Plaintiff's impairments of COPD and/or emphysema, and therefore did not determine their "severity." (Docket No. 11 at 18). In support thereof, Plaintiff avers that she uses her inhaler multiple times a day, that her breathing and chest pain upon exertion are worsening, and that cold air, hot air, and humid temperatures make her breathing problems worse. (*Id.* at 19). Plaintiff testified that even though she quit smoking prior to her thoracic aortic aneurysm surgery, her breathing problems have worsened. (*Id.* at 20). She also claims that her treatment history establishes that her impairments have more than a minimal impact on her ability to do basic work activities. (Docket No. 11 at 20). Plaintiff avers that the ALJ mischaracterized the severity of the impairment of her aorta aneurysms and the residual effects of the thoracic aortic repair. (*Id.* at 22-23). Further, Plaintiff alleges that her objective medical evidence, treatment history, and statements are substantial competent evidence to support a finding that her thoracic aortic aneurysms are severe impairments. (*Id.* at 23-14).

In response, Defendant alleges that the ALJ correctly described Plaintiff's condition, specifically that her thoracic aneurysm was surgically repaired and that the ALJ considered all of her medical records before and after surgery. (R. at 21-23, 981-82). Moreover, Plaintiff's only restrictions after surgery were "[n]o heavy lifting, excessive bending or stooping for a week."(R. at 928). The Defendant submits that the ALJ considered all impairments at later steps, including her breathing condition and thoracic aneurysm, and therefore he did not err in his Step Two analysis or in formulating Plaintiff's RFC. (R. at 15-27). Further, the Defendant alleges that the

ALJ specifically discussed Plaintiff's COPD and emphysema diagnoses and adequately accounted for any restrictions resulting from same by restricting Plaintiff to no concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. at 19, 58-62).

As previously held by this Court,[34] at Step Two, the ALJ's analysis in determining whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims"). *Magwood v. Comm'r*, 417 F. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r*, 347 F.3d 541, 546 (3d Cir. 2003)). Step Two merely serves a minimal gate-keeping function, and Plaintiff's burden to demonstrate a severe impairment is not an exacting one. *McCrea v. Comm'r*, 370 F.3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85–28, 1985 WL 56856 at *3). At Step Two, reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant. *Newell*, 347 F.3d at 547. Further, the use of Step Two as a vehicle for the denial of benefits should, "raise a judicial eyebrow," and deserves "close scrutiny." *McCrea*, 370 F.3d at 360–61. However, if the ALJ does not deny benefits at Step Two, but instead proceeds to analyze the claims under the remaining steps, a remand generally is not warranted due to the ALJ's failure to describe an alleged impairment as "severe" at Step Two, unless such error undermines the ALJ's analysis of the remaining steps and/or the ultimate disability determination. *See Salles v. Comm'r.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)); *see also Niglio*, 2013 WL 2896875, at *8. Plaintiff's testimony before the ALJ does not compel a contrary result, and credibility determinations are in the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The Court agrees with Defendant that the ALJ provided sufficient discussion and analysis of Plaintiff's breathing and vascular diagnoses and properly considered all impairments in his

---

[34] *Donley v. Colvin*, 2013 WL 6498261 (W.D. Pa. Dec. 11, 2013); *Niglio v. Colvin*, 2013 WL 2896875, (W.D.Pa. June 13, 2013).

formulation of Plaintiff's RFC. He included the following restriction: "She must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation." (R. at 19). Moreover, there is substantial evidence in the record to conclude that her thoracic aneurysm was repaired following her surgery. (R. at 22, 23, 928, 981-82, 1086, 1373, 1386). There were no irregularities with her heart, and no evidence of peri-graft flow, dissection, or chest adenopathy. (R. at 23, 1086, 1386). As Defendant notes, following this surgery, her only restriction relative to this condition was the following minimal limitation: "[no] heavy lifting, excessive bending or stooping for a week." (R. at 928). In consideration of the above, the Court holds that the ALJ adequately considered all of Plaintiff's impairments in the formulation of her RFC. Nonetheless, any failure to include those impairments within the list of severe impairments at Step Two is inconsequential, as the ALJ continued his analysis past Step Two.

### B. Aneurysms, Marfan Syndrome, and Obesity

Plaintiff contends that the ALJ failed to determine whether the combination of the impairments of her thoracic and abdominal aortic aneurysms, Marfan syndrome, and/or obesity meets or equals one of the listed impairments in Appendix 1. (Docket No. 11 at 27). Plaintiff also argues that the ALJ failed to assess the effects of obesity upon her ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, *i.e.* an eight-hour work day five days per week, or an equivalent work schedule. (SSR 02-1p); (Docket No. 11 at 27). In support thereof, she avers that her absence and withdrawal from her anesthesia technology program is sufficient to conclude that her impairments or combination of impairments equals a listed impairment or that she did not have the physical or mental ability to sustain work activities. (*Id.* at 27-28). Defendant claims that the ALJ adequately discussed his consideration of the Listing of Impairments and the relevant medical evidence in his decision. (Docket No. 15 at 19).

It is well-established that the purpose of the Listing is to describe impairments "severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience. 20 C.F.R. § 416.925(a); *Gattus v. Colvin*, 2014 WL 582261 at *7 (M.D. Pa. Feb. 14, 2014) (citing *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)). It is Plaintiff's burden to prove that her impairment meets or equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *Ortega v. Comm'r*, 232 F. App'x 194, 196 (3d Cir. 2007). Additionally, Plaintiff bears the burden of presenting medical findings equivalent in severity to *all* the criteria for the one most similar impairment to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment. 20 C.F.R. § 416.920(d); *Gattus*, at *7 (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)). "An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient." *Gattus*, at *7 (citing *Sullivan*, at 531). An ALJ should rule against Plaintiff if she does not show that she has met all of the listed criteria at Step Three. *Id.* (citing *Ortega*, at 196 (denying disability finding at Step Three based upon diabetes)); *Small v. Comm'r*, 60 F. App'x 919, 922 (3d Cir. 2003). In *Burnett v. Commissioner of Social Security Administration*, the Third Circuit required "the ALJ to set forth the reasons for his decision," and held that the ALJ's bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment was insufficient. 220 F.3d 112, 119–20 (3d Cir. 2000). The Third Circuit further noted that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d. Cir. 2004) (citing *Burnett* at 120).

Moreover, the Third Circuit adopted a "more flexible approach" at Step Three. *Sargent v. Astrue*, 2011 WL 3844192 (W.D. Pa. Aug. 30, 2011) *aff'd sub nom. Sargent v. Comm'r*, 476 F.

App'x 977 (3d Cir. 2012) (citing *Scatorchia v. Comm'r*, 137 F.App'x 468, 470–71 (3d Cir. 2005)); *see also Scuderi v. Comm'r*, 302 Fed. App'x 88, 90 (3d Cir. 2008) ("[A]n ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements."). The Third Circuit found that the ALJ "satisfied this standard by clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing" rather than requiring the ALJ to identify appropriate Listings based on the claimant's alleged impairments. *Id.* (citing *Scatorchia*, at 470-71).

Here, relative to her aneurysms, the ALJ explicitly found that Plaintiff did not meet the criteria of Listing 4.10, which states, "Aneurysm of aorta or major branches, due to any cause (e.g., atherosclerosis, cystic medial necrosis, Marfan syndrome, trauma), demonstrated by appropriate medically acceptable imaging, with dissection not controlled by prescribed treatment (see 4.00H6)." 20 C.F.R. § 404, Subpart P., App. 1, § 4.10; (R. at 18). Plaintiff underwent repeated testing, including CT scans and ultrasounds, and this objective medical evidence shows no evidence of dissection. (R. at 21-22, 623-35, 944-53). Her treatment controlled her condition, as evidenced by her successful aneurysm surgery. (R. at 981-82). Plaintiff did not present medical findings sufficient to demonstrate that her impairment met all of the listed criteria at Step Three. Moreover, the ALJ identified the medical evidence and analyzed same in making his determination. In light of the above, there is substantial objective medical evidence which supports the ALJ's finding that Plaintiff's conditions did not meet the criteria of Listing 4.10.

### C. Plaintiff's Credibility

Plaintiff contends that the ALJ erred in his determination that her statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent that

they are inconsistent with the RFC. (Docket No. 11 at 28). Additionally, Plaintiff argues that the ALJ improperly described her treatment as "conservative." (*Id.* at 29). Further, she claims that the ALJ's finding that her statements are not credible is not supported by substantial competent evidence. (*Id.* at 33). Defendant avers that Plaintiff's claims relative to her limitations are inconsistent with her treatment, her daily activities, the medical opinions, and the objective testing and examinations in the record. (Docket No. 15 at 22–26).

Credibility determinations pertaining to a claimant's testimony regarding her pain and limitations fall within the ALJ's province. *Coryea v. Comm'r.*, 2008 WL 4279809 (W.D. Pa. Sept. 16, 2008) citing *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983). After the ALJ has determined that a medical impairment exists that could reasonably cause Plaintiff's alleged symptoms, the ALJ must "evaluate the intensity and persistence of the pain" and the extent to which Plaintiff "is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Id.* (citing *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999)). A credibility determination made by the ALJ is entitled to great deference by the district court. *Reefer v. Barnhart,* 326 F.3d 376, 380 (3d Cir. 2003). However, this determination must:

> contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7; *see also Lang v. Barnhart,* 2006 WL 3858579, at *10 (W.D.Pa. Dec. 6, 2006). Where a claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence. *Williams v. Sullivan,* 970 F.2d 1178, 1184-85 (3d Cir. 1992). However, "[i]nconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garret v. Comm'r*, 274 F. App'x. 159, 164 (3d Cir. 2008).

Here, in comparing the Plaintiff's testimony with the objective medical evidence, the ALJ

found that while her medically determinable impairments reasonably could be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (R. at 20). The ALJ chose not to credit Plaintiff's allegations of disability for multiple reasons listed in his opinion, including: (1) these allegations were inconsistent with Plaintiff's medical record, (*Id.*); (2) Plaintiff received conservative treatment from her primary care providers including Dr. Mary Dillon, (*Id.*); (3) Plaintiff's treatment from Dr. Bergman, Dr. McElwain, and Dr. Malik and her treatment at the emergency room do not demonstrate disability findings, (R. at 22); (4) her cardiac condition improved after surgery and is not disabling, (*Id.*); (5) she admitted to a marked improvement in her breathing with medication at a follow-up with Dr. Rice, (*Id.*); (6) the medical record indicates that her CTS improved with treatment, (R. at 22-33); (7) objective testing is unsupportive of a finding of disability as it fails to show debilitating impairments, (R. at 23); (8) relative to her mental health, Plaintiff treated conservatively with Family Psychological Associates and has not required formal impatient mental health treatment, (R. at 25); and (9) she admitted to planning a wedding and has a relatively high GAF score with treatment, despite her allegations that she has difficulty focusing and paying attention, (*Id.*). These reasons, as explained by the ALJ in the body of his opinion, demonstrate that there is substantial evidence that Plaintiff's subjective complaints were not fully credible.

Moreover, under the applicable regulations, a plaintiff's daily activities are a valid factor to be considered by the ALJ when conducting an inquiry as to the reliability of the claimant's subjective complaints. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is not fully credible. *See Burns v. Barnhart,* 312 F.3d 113, 129-30 (3d Cir. 2002). Even "limitations that are medically supported

but are also contradicted by other evidence in the record may or may not be found credible-the ALJ can choose to credit portions of the existing evidence." *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005); *See Russo v. Astrue*, 421 F. App'x 184, 190 (3d Cir. 2011) (finding no error when the ALJ discredited testimony by the claimant which was inconsistent with her daily activities).

Here, the ALJ determined that Plaintiff's disability allegations are inconsistent with her daily activities of living. (R. at 26). The ALJ noted that Plaintiff reported in the Function Report that she takes care of her children, prepares meals, completes household chores with help, is able to manage her finances, reads, plays board games, listens to music, uses a computer, finishes what she starts, and is independent in personal care. (R. at 25, 218). Such evidence further bolsters the ALJ's credibility determination.

Finally, Plaintiff argues that the ALJ erred by failing to articulate the reasons for his credibility findings. (Docket No. 11 at 32). Plaintiff contends that the ALJ failed to accurately relate the degree of her symptoms or the extent to which they are disabling, and the ALJ did not make clear the weight given to Plaintiff's complaints and the reasons for same. (*Id.* at 32-33). Here, the ALJ's determination of Plaintiff's credibility contains specific reasons for this finding, which are supported by the evidence in the case record. The ALJ provides thorough analysis, taking into account Plaintiff's daily activities and medical records provided by Dr. Dillon, Dr. McElwain, Dr. Bergman, Dr. Malik, Dr. Pellegrini, Dr. Cook, Dr. Rice, Dr. Marone, Dr. Rhee, Dr. Grand, Dr. Balk, her objective testing records, and her ER records. (R. at 20-23). The ALJ cited and explained why this evidence is inconsistent with a finding of debilitating pain and unsupportive of a finding of disability. (R. at 20-23). There is no indication in the record that the ALJ failed to consider Plaintiff's subjective complaints, despite not being fully confirmed by the medical evidence. The ALJ's opinion sufficiently explained why he found Plaintiff's testimony

to be not fully credible. After reviewing the ALJ's analysis against the record, the Court finds that the ALJ did not err in his credibility determination, and his determination is supported by substantial evidence.

### D. Plaintiff's Ability to Handle and Finger

Plaintiff contends that the medical record supports her testimony that during the relevant period of her disability, she is unable to frequently handle and finger. In support of same, she cites her testimony that she continues to have problems with numbness and tingling, and she drops things. (Docket No. 11 at 36). The ALJ found that Plaintiff has the RFC to frequently handle and finger and has the severe impairment of bilateral CTS with carpal tunnel release. (R. at 15, 19). In making his finding, the ALJ considered all symptoms and the extent to which those systems could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. (R. at 19). He also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (R. at 19).

Here, there is substantial evidence that Plaintiff can perform frequent fingering and handling. The ALJ noted that the medical evidence demonstrates that her CTS improved with treatment. Specifically, eighteen days after her right carpal tunnel release, she reported to Dr. Balk that her numbness was much better and her nocturnal symptoms completely resolved on February 8, 2010. (R. at 22, 551). Further, Dr. Balk determined that she was doing very well after her right carpal tunnel release. (R. at 22, 551). For her left hand, she underwent carpal tunnel release and was noted to be doing well with excellent active range of motion on December 15, 2010. (R. at 1429). The ALJ adequately considered Plaintiff's severe impairment of CTS, and he did not err in determining that she can perform frequent fingering and handling and that her CTS is not disabling, as there is substantial evidence to support his findings.

### E. Jobs in the National Economy

At Step Five, the ALJ must determine whether there are jobs existing in the national economy in significant numbers that Plaintiff could perform in consideration of her age, education, past work experience, and RFC. 20 C.F.R. §§ 404.1520(g), 404.1560(c). At the ALJ hearing in this case, the ALJ asked the VE to assume that a hypothetical person with Plaintiff's age, education, and work experience: could lift and carry ten pounds occasionally; could stand or walk for two hours of an eight-hour workday; could sit for six hours of an eight-hour workday; requires a sit or stand option every 30 minutes; can never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; can frequently handle and finger; can occasionally reach overhead with the bilateral upper extremities; must avoid all exposure to hazards such as heights and moving machinery; is able to perform simple, routine, repetitive tasks; requires low-stress work defined as occasional simple decision-making; requires occasional changes in the work setting; and can have occasional interaction with co-workers, supervisors, and the public. (R. at 100-01). The VE responded that such a hypothetical person would be able to perform the representative occupations of surveillance system monitor, assembler, and mail sorter. (R. at 101) The VE further testified that these occupations exist in significant numbers in the national economy. (R. at 101).

Plaintiff contends that the ALJ erred in his finding based on the VE's response to a flawed hypothetical. She also claims that the VE's testimony relative to two of the three identified jobs, mail sorter and surveillance system monitor, was inconsistent with the definitions within the Dictionary of Occupational Titles ("DOT"), because the mental requirements for said jobs exceed her RFC for "simple, routine work." (Docket No. 11 at 36-41); (Docket No. 15 at 27). Plaintiff argues that the ALJ erred and his decision is not supported by substantial evidence. (Docket No. 11 at 38, 41). Defendant avers that, as the Plaintiff does not raise an objection to the

assembler position, there is no basis for remand, even if her contentions relative to the other two positions are correct. (Docket No. 15 at 27).

The Court of Appeals for the Third Circuit requires the ALJ to address and resolve any material inconsistencies or conflicts between the DOT descriptions and the VE's testimony. *Green*, 2010 WL 4929082 at *6 (citing *Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir. 2004)). Failure to do so may necessitate a remand. *Boone*, at 206. The DOT lists the *maximum* requirements of occupations as they are generally performed, and such criteria do not correspond to the range of requirements of a particular job as it is performed in a particular setting by a hypothetical individual with a specific vocational background. SSR 00–4p (emphasis added). Accordingly, a VE may be able to testify to more specific requirements and information about jobs or occupations than the DOT. *Id.* Moreover, to the extent that a reasoning level of 3[35] suggests mental demands beyond simple, repetitive, routine work, the reasoning level directly conflicts with the Commissioner's regulatory definition of unskilled work. *See Id.*; 20 C.F.R. §§ 404.1548, 404.1521, 416.968, 416.921. The Commissioner's regulatory definitions of skill levels control. *Id.* The DOT classifies the surveillance system monitor job as sedentary and unskilled with a specific vocational preparation ("SVP") of 2 and a reasoning level of 3. DOT code 379.367–010. To that end, to rely on the DOT's maximum reasoning levels to argue that the

---

[35] In making their determinations of whether any jobs exist that the claimant can perform, the VE or ALJ frequently consult the DOT, which is a United States Department of Labor publication containing descriptions of the requirements for thousands of jobs that exist in the national economy. *Green v. Astrue*, 2010 WL 4929082 at *4 (W.D. Pa. Nov. 30, 2010) (citing *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002)); *See also Rutherford*, at 126 (The "Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT].") (citing 20 C.F.R. § 416.966(d) (2002)). A job with a Level 1 reasoning level means that the worker is able to "apply commonsense understanding to carry out simple one or two-step instructions [and] deal with standardized situations with occasional or not variable in or from these situations encountered on the job." DOT, Appx. C: Components of the Definition Trailer. Level 2 reasoning level is defined by the worker's ability to "apply commonsense understanding to carry out detailed but uninvolved oral instructions [and] deal with problems involving a few concrete variables in or from standardized situations." *Id.* A Level 3 reasoning requires the skills to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id.*

mental demands of surveillance system monitor exceed those for simple unskilled work would be inconsistent with the Commissioner's regulations. 20 C.F.R. §§ 404.1598(a), 416.968(a).

Here, however, there were no material inconsistencies or conflicts between the DOT descriptions and the VE's testimony regarding a hypothetical person's with Plaintiff's vocational background, ability to perform the representative occupations. At the hearing, the ALJ asked the VE, "And is your testimony consistent with the information found in the Dictionary of Occupational Titles?" and the VE testified "Yes, your honor." (R. at 102). The ALJ found the VE's testimony to be reasonable and supported, and he concluded that considering her age, education, work experience, and RFC, the Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 28). The ALJ was entitled to rely upon the VE's testimony. *Green*, at *6 (citing *Gibbons v. Barnhart*, 85 Fed. Appx. 88 (10th Cir. 2003) ("The vocational expert specifically testified that the limitations of simple reading and writing were consistent with the alternative jobs he identified" and "once the VE stated that he was relying on the DOT, the ALJ had no further duty to investigate.")).

In any event, as Defendant points out, the VE identified a representative occupation, an assembler, with reasoning level of 1, consistent with the RFC determination and Plaintiff's vocational background. (Docket No. 5-3 at 61). According to the DOT, "assembler" is a sedentary occupation with an SVP of 2 and a reasoning level of 1. DOT code 734.687–0104. The VE testified that there are 280,000 assembler positions. (R. at 100). The Commissioner's regulations indicate that work exists in the national economy when there are a significant number of jobs in one or more occupations which an individual can perform. 20 C.F.R. §§ 404.1566(b), 416.966(b). At Step Five, the Commissioner's burden of production is to demonstrate that the claimant could perform work "in *one* or more occupations" which exist in significant numbers in

either the region he lived or in several regions of the country. 42 U.S.C, § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(g), 416.920(g) (emphasis added); *Green*, 2010 WL 4929082 at *5 (citing *Wright v. Sullivan*, 900 F.2d 675, 679 (3d Cir. 1990) (the Commissioner's burden at step five is satisfied when he identifies at least one occupation in the national economy which the claimant can perform)). As the VE credibly testified that there are 280,000 assembler positions in the national economy, the Commissioner's burden of production at Step Five was met, and there is substantial evidence in support of same. 20 C.F.R. §§ 404.1566(b), 416.966(b).

VI.     **CONCLUSION**

Based on the foregoing, Plaintiff's Motion for Summary Judgment [10] is DENIED, and Defendant's Motion for Summary Judgment [14] is GRANTED. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

September 11, 2014
cc/ecf: All counsel of record.